Michael H. Bierman, State Bar No. 89156
Jeffrey D. Wexler, State Bar No. 132256
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
601 S. Figueroa, Suite 3900
Los Angeles, California 90017
Telephone No.: 213.892.4992
Fax No.: 213.892.7731
E-Mail:   mbierman@luce.com
          jwexler@luce.com

Thomas S. Kiddé, State Bar No. 61717
LEWIS BRISBOIS BISGAARD & SMITH LLP
221 N. Figueroa, Suite 1200
Los Angeles, California 90012-2601
Telephone No.: 213.250.1800
Fax No.: 213.250.7900
E-Mail: kidde@lbbslaw.com

Attorneys for Plaintiff and Counterdefendant
K&N Engineering, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| K&N ENGINEERING, INC., a California corporation,<br><br>　　　Plaintiff,<br><br>v.<br><br>SPECTRE PERFORMANCE, a California corporation,<br><br>　　　Defendant.<br>_____<br><br>SPECTRE PERFORMANCE, a California corporation,<br><br>　　　Counterclaimant,<br><br>v.<br><br>K&N ENGINEERING, INC., a California corporation,<br><br>　　　Counterdefendant.<br>_____ | Case No. EDCV 09-1900 VAP (DTBx)<br><br>**[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF AND COUNTERDEFENDANT K&N ENGINEERING, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST CLAIMS ASSERTED IN FIRST AMENDED COUNTER-COMPLAINT OF DEFENDANT AND COUNTERCLAIMANT SPECTRE PERFORMANCE**<br><br>Date: May 16, 2011<br>Time: 2:00 p.m.<br>Courtroom: 2<br><br>Trial Date: June 28, 2011 |

After consideration of the papers in support of and in opposition to the motion of plaintiff and counterdefendant K&N Engineering, Inc. ("K&N") for summary judgment against the Amended Counter-Complaint of defendant and counterclaimant Spectre Performance ("Spectre"), and after consideration of the oral argument of counsel, the Court determines that the following facts have been established as uncontroverted and makes the following conclusions of law.

## UNCONTROVERTED FACTS

### A.     Background Facts.

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 1.     K&N and Spectre sell competing automotive air intake products – high performance washable air filters (including those replacing original equipment manufacturer ("OEM") disposable air filters) and high performance air intake systems, which replace the entire factory-installed air path to the engine and include an air filter. | Declaration of Steve Williams ("Williams Decl."), ¶ 3. |
| 2.     K&N is an inventor, manufacturer, distributor, and the leading innovator of cotton gauze reusable air filters for use in automobiles and motorcycles.  K&N has sold more than 32 million reusable air filters since 1969.  K&N sells more than | Williams Decl., ¶ 4. |

1

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 3,000 different cotton gauze air filters, representing more than 50 percent of the market for replacement performance air filters. | |
| 3.      K&N also designs, builds, and tests air intake systems.  K&N currently manufactures more than 600 different air intake systems.  Since 1992, K&N has sold more than 2.2 million air intake systems in the United States and abroad. | Williams Decl., ¶ 5. |
| 4.      Spectre began selling cotton gauze reusable air filters in or about 2004, and it began selling air intake systems in or about 2007. | Williams Decl., ¶ 6. |
| 5.      Spectre's catalog on its website includes about 142 different air filters and about 31 different air intake systems (exclusive of air intake systems that customers may build using Spectre's modular intake kits). | Williams Decl., ¶ 6. |
| 6.      High performance air filters and air intake systems are added to vehicles as "upgrade" or "premium" products, replacing disposable OEM filters and stock air intakes. | Williams Decl., ¶ 8. |

2

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 7.      These air filters and air intake systems are designed to reduce the restriction on the amount of air flowing into a vehicle's engine caused by the stock air filter and intake, and thereby to potentially increase the vehicle's engine power. | Williams Decl., ¶ 8. |
| 8.      The restrictiveness of air filters is typically measured by the air flow they allow, measured in cubic feet per minute ("CFM").  Engine power is typically measured in horsepower ("HP"). | Williams Decl., ¶ 8. |
| 9.      Air intake systems are not legal for highway use in California for a particular automotive application (model, make, year, and engine size) unless the California Air Resources Board ("CARB") has issued an Executive Order for that particular application. | Cal. Veh. Code § 27156; Williams Decl., ¶ 43. |
| 10.     Most air intake systems will fit more than one vehicle application. | Williams Decl., ¶ 5. |
| 11.     Sellers advertising in California air intake systems for applications as to which there is no Executive Order are | 13 Cal. Code Reg. § 2222. |

3

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| required to give a disclaimer of limitations on sale or use of the systems. | |

**B.     Facts re K&N's Motion for Summary Judgment with Regard to its Air Flow Comparison Graph.**

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 12.     The restriction of air flow created by an automotive filter or air intake system creates an air pressure differential between two points in an air filter system, usually from a point upstream from the filter to a second point just downstream from it. | Declaration of Kenneth Conti ("Conti Decl."), ¶ 3; Deposition of Harold Bettes ("Bettes Depo."), Vol. I, at 134:15-23, 138:7-11 (Ex. 1 to Declaration of Thomas S. Kiddé ("Kiddé Decl.")). |
| 13.     For any given rate of air flow, a higher restriction between measurement points will result in a higher pressure differential, or "pressure drop," commonly measured in inches of water. | Conti Decl., ¶¶ 3-4; Bettes Depo., Vol. I, at 138:14-17 (Ex. 1 to Kiddé Decl.). |
| 14.     The pressure drop created by air flow restrictions is generally cumulative. | Conti Decl., ¶ 4; Bettes Depo., Vol. I, at 138:18-20, 139:24 – 140:6 (Ex. 1 to Kiddé Decl.). |
| 15.     If there is more than one source of restriction in a flow of air – for example, an air filter and a narrow pipe | Conti Decl., ¶ 4. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| – the pressure drop across the restrictions will generally be around the sum of the individual pressure drops across each. | |
| 16.    Just as a lower pressure drop at the same air flow rate indicates less restriction, so does a higher air flow rate on a flow bench at the same pressure drop.  Therefore, the relative restrictiveness of different air filters can be compared by comparing the air flow through the filters, measured at the same pressure drop and in the same manner. | Conti Decl., ¶ 5. |
| 17.    Air flow measurements are meaningless without reference to the pressure drop at which they were taken. | Conti Decl., ¶ 5. |
| 18.    Since 2002, K&N's packaging for its high-flow air filters has included two bar graphs, each of which compares air flow rates for a "K&N Washable Reusable Air Filter" and an "Average Disposable Aftermarket Air Filter." | Amended Counter-Complaint, Ex. E (Ex. 10 to Kiddé Decl.); Williams Decl., ¶ 17. |
| 19.    The packaging states: AIR FLOW COMPARISON CHART Dust-free air flow test performed on laboratory | Amended Counter-Complaint, Ex. E (Ex. 10 to Kiddé Decl.). |

5

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| equipment.<br><br>These charts are examples of individual filters. Results will vary depending on part number and vehicle.  Complete test protocol and results available at www.knfilters.com.<br><br>The bar graphs report: (1) air flow rates of 881 CFM and 545 CFM, respectively, for a K&N round filter (part no. E-1500) and a comparable average disposable aftermarket air filter; and (2) air flow rates of 441 CFM and 319 CFM, respectively, for a K&N panel filter (part no. 33-2042) and a comparable average disposable aftermarket air filter. | |
| 20.     Since 2001, K&N has tested air flow through filters in-house using the same protocol, which is set forth on its website.  The explanation appears at http://www.knfilters.com/testmethod.htm). | Williams Decl., ¶ 11, Ex. 1. |
| 21.     K&N uses a SuperFlow Corporation SF-1020 flow bench and measures the air flow through its filters | Williams Decl., ¶¶ 9-12. |

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| at a standard pressure drop of 1.5" H2O. That pressure drop is well within the range of pressure drops experienced across automotive air filters in use in ordinary driving. | |
| 22.     K&N uses the same specially constructed fixtures to test air filters, and it measures the air pressure after passing through the filter in the same place for each type of filter: (1) for round filters at a point one inch below the point at the center of the filter; and (2) for panel filters at a point in the lower corner of the filter fixture. | Williams Decl., ¶¶ 13-15. |
| 23.     Kenneth Conti, an engineering expert with 45 years experience designing and testing air filters, has opined that K&N's protocol is reliable. | Conti Decl., ¶¶ 7-11. |
| 24.     Using its protocol, K&N has on a number of occasions performed air flow testing on the K&N filters shown in the graphs – the K&N E-1500 round filter and the 33-2042 panel filter – and comparable competing disposable filters. | Williams Decl., ¶¶ 17-18, Exs. 3-6. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 25.    K&N obtained the test results shown on the air flow comparison graph in testing performed in June 2001 (for the E-1500 filter and equivalent competitors' filters) and April 2002 (for the 33-2042 filter and equivalent competitors' filters). | Williams Decl., ¶ 17, Exs. 3, 4. |
| 26.    Since that time, K&N has continued to test both its own filters and competitors' paper filters.  The test results have been consistent with those stated on K&N's packaging.  On a number of occasions, K&N testing has determined that the measured air flow of the K&N filter was considerably more than that stated on K&N's packaging. | Williams Decl., ¶ 18, Exs. 5, 6. |
| 27.    One test showed the K&N E-1500 filter flowing an average of 817.1 CFM at 1.5" H2O, about 10 percent less than the 881 CFM recorded on the test reported on K&N's product packaging. Another test showed the same filter flowing 969.3 CFM at 1.5" H2O, about 10 percent higher than the advertised rate. | Williams Decl., Ex. 5. |

8

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 28.     Independent testing performed by Southwest Research Institute ("SWRI") in July 2002 and January 2003 using the standard air filter testing methods prescribed by the Society of Automotive Engineers ("SAE") J726 JUN93 Air Cleaner Test Code has confirmed that the air flow through K&N's round E-1500 filter exceeded that of a comparable disposable aftermarket air filter by more than the amount stated on the air flow comparison graph. | Williams Decl., ¶ 20, Exs. 9, 10; Conti Decl., ¶ 11, Exs. 3-4. |
| 29.     Independent tests commissioned in March 2002 found that the air flow through the K&N E-1500 filter exceeded that stated on the air flow comparison graph. | Williams Decl., ¶ 19, Exs. 7, 8. |
| 30.     In a rebuttal report and at deposition, its technical expert, Harold Bettes, had originally opined that testing at a pressure drop of 1.5" H2O might create a problem because the air flow at that pressure drop might be laminar – not turbulent – thereby skewing the test results.  He testified that he had | February 18, 2011 Rebuttal Report of Harold Bettes (as amended on February 22, 2011) at 1 (Ex. 16 to Kiddé Decl.); Bettes Depo., Vol. I, at 145:15 – 153:12 (Ex. 1 to Kiddé Decl.). |

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| determined that the air flow was laminar at a pressure drop of 1.5" H2O by calculating a Reynolds number of about 2,000.  This was the only theoretical reason he identified why K&N's air flow testing at 1.5" H2O might yield inaccurate results. | |
| 31.    Mr. Bettes thereafter corrected this testimony, explaining that he had made an error in calculating the Reynolds number and that "[t]he lowest number is about 835,000 which is substantially turbulent." | Bettes Depo., Vol. II, at 343:7 – 344:1 (Ex. 2 to Kiddé Decl.). |
| 32.    In his "supplemental" expert report, Mr. Bettes presented the results of air flow testing he conducted of K&N filters and analogous competitive filters. | February 18, 2011 Supplemental Report of Harold Bettes (as amended on February 22, 2011) at 1 (Ex. 15 to Kiddé Decl.). |
| 33.    The testing did not duplicate the K&N test protocol.  For most of that testing, Mr. Bettes and Spectre measured the air pressure using the internal SuperFlow pressure tap, located beneath the hole in the flow bench. | February 18, 2011 Supplemental Report of Harold Bettes (as amended on February 22, 2011) at 3-7, Exs. I-L (Ex. 15 to Kiddé Decl.). |
| 34.    Measuring air pressure at that point, rather than where K&N measures | Conti Decl., ¶¶ 12-13; Bettes Depo., Vol. I, at 142:19 – 145:14 (Ex. 2 to |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| it, will yield different air flow results. | Kiddé Decl.). |
| 35.    For the Spectre testing that did not use the internal pressure tap, Mr. Bettes testified that its point "was to show specifically that the placement of the pressure tap changes results," not to duplicate K&N's test methods. | Bettes Depo., Vol. II, at 470:10 – 471:13 (Ex. 2 to Kiddé Decl.). |
| 36.    In response to the question, "What is wrong with where K&N picked to put its pressure [tap] in its airflow testing of its E-1500 filter?," Mr. Bettes responded, "I wouldn't call it wrong.  I would call it producing different numbers."  He testified that he would test in such a way that "the operator would have less influence on [the] position of a probe or a pressure tap."  (In fact, the tube used by K&N is marked to allow the operator to easily place it in a uniform position.)  He testified that he was aware of no evidence of such operator influence, and that he could not "off the top of my head" identify anything else wrong with how K&N did its testing of round | Bettes Depo., Vol. I, at 297:16 – 298:25, 302:16-22 (Ex. 1 to Kiddé Decl.); Williams Decl., ¶ 14. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| filters.  He testified that he had no problem with K&N's testing of its panel filters. | |
| 37.    Finally, Mr. Bettes testified that he had no reason to believe that variations in K&N's air flow test results reflected bad testing as opposed to a natural variation in filters. | Bettes Depo., Vol. I, at 231:17 – 233:1 (Ex. 1 to Kiddé Decl.). |

**C.    Facts re K&N's Motion for Summary Judgment with Regard to its Horsepower Advertising.**

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| 38.    K&N makes two types of statements about the horsepower resulting from replacing a stock air intake with a K&N air intake system. | Amended Counter-Complaint, Ex. B (Ex. 10 to Kiddé Decl.); Williams Decl., ¶ 41, Ex. 14. |
| 39.    First, it makes a "horsepower guarantee" for its air intake systems, which appears on the packaging, in K&N ads and on K&N's website.  The guarantee is:<br><br>K&N hereby warrants and guaranties to the original retail purchaser of any K&N air intake kit that the vehicle on which the air intake system is installed will gain an increase in | Amended Counter-Complaint, Ex. B (Ex. 10 to Kiddé Decl.); Williams Decl., ¶ 41, Ex. 14. |

12

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| horsepower, or K&N will refund the purchase price, including sales tax, to the retail purchaser, subject to the following terms and conditions: . . . | |
| 40.    Second, K&N publishes on its web site a comparison graph for most of its air intake systems showing the horsepower and torque gains K&N achieved by installing that intake system on one or more particular vehicles. K&N has advertised some of these results in print media. | Williams Decl., ¶ 34. |
| 41.    K&N's advertising does not state that K&N performs dyno tests for each air intake system and for each vehicle for which that system is suggested.  Nor does it state that use of K&N's air intake systems guarantees that consumers will achieve specific horsepower gains on their own vehicles. | Williams Decl., ¶ 42. |
| 42.    As Spectre concedes, a viewer of K&N's statements would have to combine various aspects of them order to reach the conclusion Spectre alleges is false. | Deposition of Michael Morrow at 211:4 – 212:16 (Ex. 7 to Kiddé Decl.). |

13

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 43.    K&N and its competitors, including Spectre, use chassis dyno tests to evaluate the performance of their own parts and competitors' parts, including air intake systems. | Williams Decl., ¶ 22; Deposition of David Johnston ("Johnston Depo."), Vol. II, at 122:21 – 123:3 (Ex. 5 to Kiddé Decl.); Johnston Depo., Vol. III, at 191:12 – 192:4 (Ex. 6 to Kiddé Decl.); H. Bettes, *Dyno Testing and Tuning*, at 4, 6, 11 (chassis tests are a well-established means used by race teams and performance buffs and "have been relied on for as long as anyone can remember") (Ex. 18 to Kiddé Decl.). |
| 44.    One requirement for reliable dyno testing is the control of a number of variables that can affect test results. These variables include air intake and coolant temperature, under-hood temperature, oil temperature, air/fuel ratio, ignition timing or spark advance, tire pressure, condition of the engine, barometric pressure, use of shop fans and tie down tension. | Williams Decl., ¶ 24; Bettes Depo., Vol. I, at 166:2 – 167:25 (Ex. 1 to Kiddé Decl.); Johnston Depo., Vol. 3, at 206:10 – 207:18. |
| 45.    Over the years, K&N has performed thousands of chassis dyno tests as part of its research and development to evaluate the horsepower | Williams Decl., ¶ 36. |

14

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| gains achieved from replacing stock factory air intakes with K&N air intake systems. | |
| 46.    K&N has performed more than 700 dyno test comparisons on more than 500 vehicles showing an increase in horsepower in those vehicles when the stock air intake is replaced with a K&N air intake system. | Williams Decl., ¶¶ 36-37, Ex. 11. |
| 47.    Since 2004, K&N has published the results of these comparisons on its website. | Williams Decl., ¶ 36. |
| 48.    K&N uses a standard dyno testing protocol that it follows for all tests performed.  The protocol requires a 70-mile drive test before dyno testing, to obtain the range of critical temperatures, including air inlet temperature and under-hood temperature, and other engine characteristics experienced in ordinary driving.  It dictates the tie down procedure for the test vehicle, the aspects of the vehicle, such as tire pressure, to be checked, and the placement of cooling fans.  K&N runs | Williams Decl., ¶¶ 23, 25-32. |

15

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| its dyno tests controlling for the variables that can affect results, monitoring all critical temperatures and other engine information to allow it to duplicate driving conditions to the extent possible.  For the same reason, it runs most of its tests in third gear and with the hood open. | |
| 49.      Consistent with industry literature, including an article quoting the manufacturer of the dyno Spectre uses, K&N's experience is that if the hood is closed, heat builds up, preventing the coolant and air inlet temperatures from returning to the desired "road test" levels, and the "heat soaked" engine loses timing, thereby reducing the horsepower.  Fans, while a means of moving air in to the front grill of the vehicle, do not typically run at rates approximating the air flow of a moving vehicle at 60 miles per hour, nor can they provide the same air flow coming from underneath the vehicle. | Williams Decl., ¶ 28; article entitled *Dyno Accuracy Testing – Dyno Scruples*, authored by Stephen Kim, published in July 2008 issue of *Popular Hot Rodding* (Ex. 19 to Kiddé Decl.). |
| 50.      The results of the dyno testing are | Williams Decl., ¶ 35. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| presented in a graph format which has been "smoothed" for presentation purposes but which does not materially affect the comparison. | |
| 51.     This protocol was used in *all* of K&N's tests, including its tests of air intake system 63-1114 installed on a 2008 Dodge Challenger 6.1L and air intake system 57-2751 on the 2007 Ford Mustang Shelby GT500. | Williams Decl., ¶¶ 23, 41. |
| 52.     For this litigation, Spectre performed some dyno tests on Dodge Challengers with the K&N 63-1114 air intake system and on a 2007 Ford Mustang GT500 with the K&N 57-2571 air intake system, without controlling for many of the variables that can affect test results.  In these tests, Spectre followed a different dyno testing protocol, without a road test to determine normal engine temperatures before the dyno test, without monitoring temperatures and other engine information during the dyno test, and running the dyno tests in fourth gear | Johnston Depo., Vol. III, at 193:9-16, 194:7 – 195:3, 218:9-23 (Ex. 6 to Kiddé Decl.); Bettes Depo., Vol. I, at 254:15-17, 261:15-23 (Ex. 1 to Kiddé Decl.); February 18, 2011 Supplemental Report of Harold Bettes (as amended on February 22, 2011), Exs. A-E (Ex. 15 to Kiddé Decl.). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| and, except for one run, with the hood closed. | |
| 53.     In successive tests on the same dyno, Spectre obtained substantially different results testing the same vehicle with the same air intake system. | February 18, 2011 Supplemental Report of Harold Bettes (as amended on February 22, 2011), Exs. A-E (Ex. 15 to Kiddé Decl.). |
| 54.     Mr. Bettes had no explanation for the variations. | Bettes Depo., Vol. II, at 450:3-7, 450:19 – 451:4, 452:2-7 (Ex. 2 to Kiddé Decl.). |
| 55.     Spectre also tested a Dodge Challenger in September 2009 at Westech Performance, an independent dyno testing shop. | Deposition of Steven Brule ("Brule Depo.") at 13:17 – 14:7 (Ex. 3 to Kiddé Decl.). |
| 56.     Although Westech generally follows dyno testing protocol similar to K&N's, collects the relevant temperature data, and tests vehicles with the hood open, it was instructed not to do so by Spectre for these tests.  The data not collected in the Spectre tests is so crucial to Westech's evaluation of dyno test results that Westech cannot draw any conclusions from the data produced by the Spectre tests at Westech. | Brule Depo. at 10:19 – 11:13, 23:14 – 24:8, 25:12 – 26:22, 30:24 – 31:9, 64:21 – 66:18 (Ex. 3 to Kiddé Decl.); Ex. 119 to Brule Depo. (first page) (Ex. 4 to Kiddé Decl.). |
| 57.     Mr. Bettes testified his opinion | Bettes Depo., Vol. II, at 430:25 – |

18

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| was that Spectre's dyno testing got different results from K&N's and that he could not say that there was anything wrong with the dyno tests K&N conducted. | 431:23 (Ex. 2 to Kiddé Decl.). |
| 58.     Spectre's initial expert reports did not include a survey or other evidence of how consumers perceive K&N's horsepower statements or any other K&N advertising.  However, the February 18, 2011 rebuttal report of Spectre's damages expert Christian Tregillis attached a report from Dr. S. Christian Wheeler, a survey expert, that provided the results of a survey as to, *inter alia*, consumer perceptions of an allegedly false K&N advertisement concerning horsepower gain.  Mr. Tregillis' February 18, 2011 rebuttal report relied on the survey solely as evidence of consumer perceptions of **Spectre** advertising.  In a reply to rebuttal report served on March 10, 2011, Mr. Tregillis relied on the survey as evidence of consumer perceptions of | Docket 60; Docket 65, Ex. O at 8-9 (filed under seal); Docket 61-23; Docket 65, Ex. Y, at 11-12 (filed under seal). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| *K&N* advertising. | |
| 59.　A K&N advertisement, reproduced in Exhibit D to the Amended Counter-Complaint, erroneously mislabeled dyno test results for a 2005 Dodge Magnum RT 5.7L as being test results for a 2009 Dodge Challenger 6.1L,  K&N in fact obtained substantially greater horsepower gains from the air intake system installed on a 2008 Dodge Challenger 6.1L (functionally identical to the 2009 model) than the advertised 21.09 horsepower difference. | Amended Counter-Complaint, Ex. C at 14 (Ex. 11 to Kiddé Decl.); Amended Counter-Complaint, Ex. D at 18 (Ex. 12 to Kiddé Decl.); Williams Decl. ¶¶ 39-40, Ex. 12. |

### D.　Facts re K&N's Motion for Summary Judgment with Regard to its Alleged Non-Compliance with CARB Regulations.

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 60.　K&N's web site and its catalogs made available at retail stores identify each application for which each K&N air intake system is sold and state whether K&N has obtained an Executive Order for each such | Williams Decl., ¶ 44. |

20

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| application. For those applications without an Executive Order, they contain a CARB disclaimer. | |
| 61.    K&N's Typhoon air intake system (Part No. 69-2526TP) is sold for some applications that are the subject of a CARB Executive Order and others that are not. | Williams Decl., ¶ 47. |
| 62.    As a result of an error, beginning in August 2009, the instruction sheet inside the packaging for this air intake system omitted a disclaimer identifying the applications for which the system was not subject to an Executive Order. K&N corrected the instructions to include that disclaimer in November 2009, months before Spectre filed its Counter-Complaint. | Williams Decl., ¶ 47. |
| 63.    With this exception, K&N is unaware of having sold any air intake system that is not the subject of a CARB Executive Order for some or all applications without a disclaimer on the instructions identifying the applications lacking an Executive Order. | Williams Decl., ¶ 47. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 64.     Besides the evidence relating to the 69-2526 air intake system set forth above, Spectre has offered no other evidence of K&N CARB violations. | Responses and Objections of Defendant and Counterclaimant Spectre Performance to Plaintiff and Counterdefendant K&N Engineering, Inc.'s First Set of Interrogatories dated October 4, 2010, Responses to Interrogatories Nos. 8 and 9 (Ex. 17 to Kiddé Decl.); Kiddé Decl., ¶ 13. |
| 65.     On October 4, 2010, Spectre served its responses to K&N's First Set of Interrogatories.  Interrogatory No. 8 asked, "Other than the Typhoon Air Intake System, Part No. 69-2526 TP, identify each and every other product of K&N which You contend K&N has sold since 2002 without an Executive Order of the California Air Resources Board or a legally adequate disclaimer." Spectre did not identify any other products.  Spectre has never provided a supplemental response to this interrogatory. | Responses and Objections of Defendant and Counterclaimant Spectre Performance to Plaintiff and Counterdefendant K&N Engineering, Inc.'s First Set of Interrogatories dated October 4, 2010, Responses to Interrogatories Nos. 8 and 9 (Ex. 17 to Kiddé Decl.); Kiddé Decl., ¶ 13. |
| 66.     Spectre president Amir Rosenbaum testified at deposition that he was unaware of any other alleged | Deposition of Amir Rosenbaum ("Rosenbaum Depo."), Rosenbaum Depo., Vol. I, at 348:12-17 (Ex. 8 to |

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
| --- | --- |
| violations. | Kiddé Decl.). |

**E.    Facts re K&N's Motion for Summary Judgment with Regard to AutoAnything's Advertisements re Fuel Economy.**

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
| --- | --- |
| 67.    K&N sells its products through a wide range of distributors and retailer customers. | Williams Decl., ¶ 5. |
| 68.    One such customer, AutoAnything.com, includes in its ads for K&N products (and the products of others) assertions that the products being advertised will increase fuel economy or "save gas." | Amended Counter-Complaint, ¶¶ 21-24, Ex. H (Ex. 14 to Kiddé Decl.). |
| 69.    K&N did nothing to cause AutoAnything.com to make these claims.  It never approved or adopted these advertisements and it has not exerted legal control over the content of AutoAnything's ads. | Declaration of Tim Martin ("Martin Decl."), ¶¶ 6-7. |
| 70.    AutoAnything.com makes the same "saves gas" claims about the Spectre filters it sells. | Kiddé Decl., ¶ 16, Ex. 20. |

23

| **UNDISPUTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 71.    Spectre, also, has no control of AutoAnything.com's advertisements of Spectre's products. | Rosenbaum Depo., Vol. II, at 349:23 – 350:9, 350:21-22 (Ex. 8 to Kiddé Decl.). |

## CONCLUSIONS OF LAW

72.    A summary judgment motion may be granted only when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

73.    "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

74.    "The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

75.    "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case,'" which it may do by "'pointing out through argument'" "the absence of evidence to support plaintiff's claim.'" *Id.* at 325 (quoting *Celotex Corp.*, 477 U.S. at 323, and *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000)).

76.    If "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

77.    "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322).

78.    When ruling on a motion for summary judgment, the Court is to exclude expert evidence pursuant to Fed. R. Civ. P. 37(c) based upon a party's failure to disclose such evidence in a timely manner, unless the party shows that its failure to disclose is substantially justified or harmless. *See*, *e.g.*, *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1364-65 (Fed. Cir. 2011) (applying Ninth Circuit law); *Wong v. Regents of Univ. of California*, 410 F.3d 1052, 1058-60 (9th Cir. 2005).

79.    The Lanham Act imposes liability for false advertising:

> The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. . . .

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003) (same).

80.    "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139 (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943, 946 (3d Cir. 1993)).

81.    The air flow comparison graphs are "tests prove" claims, and Spectre asserts that they are literally false.

> To prove that an advertisement claim based on product testing is literally false, "a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." . . . "Rather, the plaintiff must demonstrate that such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made." . . . A plaintiff may meet this burden either by attacking the validity of the

25

> defendant's tests directly or by showing that the defendant's tests are contradicted or unsupported by other scientific tests. . . .

*Southland Sod Farms*, 108 F.3d at 1139 (citations omitted).

82.     The maker of a "tests prove" claim need not establish that its testing procedures are perfect to avoid a false advertising claim.  Even if a testing methodology used is imperfect in some respect, that fact alone does not render an advertisement reporting a test result false.  *See Johnson & Johnson VisionCare, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1249 (11th Cir. 2002) (study supported claim even though its design did not control for "modality," "i.e., length of time wearing the lens, one day wear versus two week wear").

83.     The fact that a party obtained different test results using a different testing protocol simply does not demonstrate that the adverse party's "tests are not 'sufficiently reliable' to support the advertised conclusion with 'reasonable certainty.'"  *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrel Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996).

84.     In *Derby Indus., Inc., v. Chestnut Ridge Foam, Inc.*, 202 F. Supp. 2d 818 (N.D. Ind. 2002), the court found that since the test at issue could be performed under varying conditions, the plaintiff had failed to show how the defendant's test "yielded an unreliable result; a result that would not allow one to  conclude with a 'reasonable certainty that the tests established the proposition for which they were cited.'"  *Id.* at 824-25 (quoting *Proctor & Gamble v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 119 (2nd Cir. 1984)).

85.     Because Spectre has introduced no evidence that K&N's test method is unreliable or scientific tests providing contradictory results, it cannot prove that K&N's air flow comparison graphs are false.

86.      Spectre has offered no evidence that K&N's dyno testing protocol is unreliable or that the tests at issue were not conducted in accordance with that protocol or were manipulated in some other way.  Accordingly there is no evidence in the record

based on K&N's testing that would support Spectre's claim that the published K&N test results are literally false.

87.     The fact that Spectre obtained different dyno test results using a different testing protocol simply does not demonstrate that K&N's "tests are not 'sufficiently reliable' to support the advertised conclusion with 'reasonable certainty.'"  *Rhone-Poulenc Rorer Pharms.,* 93 F.3d at 515.  *See Derby Indus., Inc.,* 202 F. Supp. 2d at 824-25.

88.     To establish literal falsity, Spectre must show that consumers will "unavoidably" receive the allegedly false message.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 587 (3rd Cir. 2002).

89.     In evaluating whether an advertisement is literally false, a district court "must analyze the message conveyed in full context," *Castrol Inc.*, 987 F.2d at 946, and not engage in "disputatious dissection" of the advertisement at issue, *Avis Rent a Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986).

90.     "[O]nly an unambiguous message can be literally false," *Novartis Consumer Health, Inc.*, 290 F.3d at 587; if the language is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false, *see Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002).

91.     Here, there is no evidence in the record that consumers will "unavoidably" receive the messages alleged by Spectre – those messages are nowhere conveyed explicitly.  Rather, the essence of Spectre's claims is that consumers are likely to be misled by K&N's Horsepower Guarantee and the way K&N publishes its test results into believing that (1) K&N tests all makes and models of vehicles and (2) consumers will achieve specific horsepower gains on their own vehicles.

92.     In order for Spectre to prevail on these claims, it must present evidence of consumer confusion – *i.e.*, evidence of how the viewer or consumer integrates the various components of the ads to reach the conclusion alleged by Spectre that specific horsepower gains will be achieved every time a K&N intake system is installed on a

27

consumer's vehicle.  *See William H. Morris Co. v. Group W., Inc*., 66 F.3d 255, 258 (9th Cir. 1995).

93.    "A plaintiff relying upon statements that are literally true yet misleading 'cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react.'"  *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir. 1990)).

94.    If a statement is not literally false and is only misleading in context, proof that the advertising actually conveyed the implied message, and thereby deceived a significant portion of the recipients, becomes critical and must be presented by extrinsic evidence.  *See Mutual Pharm. Co. v. Ivax Pharms., Inc.*, 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006).

95.    "Reactions of the public are typically tested through the use of consumer surveys."  *Southland Sod Farms*, 108 F.3d at 1140.

96.    "Thus, if the plaintiff has no survey evidence, its false adverting [*sic*] claim usually must stand or fall on its claim that the challenged ad is literally false."  5 J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 27:55, at 27-113 (2010) (footnote omitted).  *See Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, 2010 WL 1903431 at *8-9 (W.D. Wash. May 11, 2010) (where the plaintiff's survey did not ask any questions pertaining to a literally true statement, the plaintiff failed as a matter of law to prove its claim based on this statement).

97.    It is Spectre's burden to establish that the consumers would have understood the advertising in the manner Spectre claims and that a significant portion of the recipients were so deceived.  *See William H. Morris Co.*, 66 F.3d at 258.

98.    Having based its original Counter-Complaint on its claims that K&N's horsepower statements are misleading, Spectre was required to produce the necessary survey evidence at the time the initial expert reports were served on October 1, 2010.  *See* Fed. R. Civ. P. 26(b)(2)(C) (initial expert disclosure must contain all non-rebuttal

28

1    opinions).  It elected not to.  It therefore cannot present any admissible survey evidence

2    now.

3         99.    In the absence of actual evidence of consumer confusion, a plaintiff may

4    pursue a Lanham Act claim based upon a true but misleading advertising claim where the

5    defendant "intentionally misled consumers" because such intent supports a presumption

6    of deception.  *William H. Morris Co.*, 66 F.3d at 258-59.

7         100.   That presumption is unavailable here because there is no evidence that K&N

8    knew or believed its horsepower claims to be false or that it intended to confuse

9    consumers with regard to such claims.

10        101.   Instructions inside a package do not constitute "commercial advertising or

11   promotion" actionable under the Lanham Act; "[s]tatements made inside the product's

12   packaging, available to consumers only after the purchase has been made, do not affect

13   the choice to purchase, that choice having been made at an earlier point."  *Gillette Co. v.*

14   *Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 134-35 (D. Mass. 1996).  *See*, *e.g.*,

15   *Rice*, 330 F.3d at 1181 (alleged false statements on a video jacket did not constitute false

16   advertising; "the videotape jacket could not be observed by potential consumers, and

17   therefore could not influence the purchasing decision"); *Wilchcombe v. TeeVee Toons,*

18   *Inc.*, 515 F. Supp. 2d 1297, 1306 (N.D. Ga. 2007) ("the CD inserts that defendants

19   distributed with the Album do not qualify as commercial advertising or promotion";

20   "[t]he public retrieved the CD inserts only after buying the Album, and therefore they

21   could not have had a material effect on purchasing decisions"); *Marcyan v. Nissen Corp.*,

22   578 F. Supp. 485, 507 (N.D. Ind. 1982) (no liability for statements made in user's manual

23   not made "available until after the purchase was made"; "there is no likelihood of

24   influencing the purchasing decision"), *aff'd*, 725 F.2d 687 (7th Cir. 1983).

25        102.   In addition, Spectre could not in any event pursue a false advertising claim

26   based upon K&N's failure to put a disclaimer on the packaging for its air intake systems

27   because "the Lanham Act 'imposes no affirmative duty of disclosure.'"  *Avon Prods.,*

28

29

*Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 798 (S.D.N.Y. 1997) (citation omitted).

103.   Furthermore, "[f]alse advertising claims based on allegations of implied governmental approval have not been allowed, for 'the law does not impute representations of government approval . . . in the absence of explicit claims.'" *Merck & Co., Inc. v. MSD Tech., L.P.*, 425 F. Supp. 2d 402, 417-18 (S.D.N.Y. 2006) (quoting *Avon Prods., Inc.*, 984 F. Supp. at 796).  *See IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 372-74 (5th Cir. 2002) ("the defendants' failure to label the product in keeping with [agency] regulations, even if true, does not constitute a false or misleading statement that is actionable under the Lanham Act").

104.   Finally, Spectre has no evidence of any instances in which K&N allegedly sold any air intake system not subject to an Executive Order without providing a disclaimer, except the one air intake system identified in the Counter-Complaint (Part No. 69-2526TP).

105.   K&N is entitled to summary judgment as to Part No. 69-2526TP on the grounds that the alleged violation appeared on materials not visible to a potential buyer and as to K&N's other air intake systems on that ground and because Spectre has identified no other systems making false or misleading CARB claims.

106.   Where, as here, K&N does not exercise any control over the advertisements of AutoAnything.com, there can be no liability.  *See Campagnolo S.r.l. v. Full Speed Ahead, Inc.*, 2010 WL 2079694 at *7-8 (W.D. Wash. May 20, 2010) (parent could not be held liable for subsidiary's false advertising where it did not "exercise[] any oversight over the content of [the subsidiary's] advertising campaigns and did "not control the manner of that advertising").

107.   Any conclusion of law deemed to be a finding of fact is hereby incorporated into the findings of fact.

DATED: _____, 2011

30

The Honorable Virginia A. Phillips
United States District Judge

Submitted by:

LUCE, FORWARD, HAMILTON &
 SCRIPPS LLP
Michael H. Bierman
Jeffrey D. Wexler

LEWIS BRISBOIS BISGAARD & SMITH LLP
Thomas S. Kiddé


    /s/ Michael H. Bierman
        Michael H. Bierman
Attorneys for Plaintiff and
Counterdefendant K&N Engineering,
Inc.

201105266.1

31